Opinion
WERDEGAR, J.
In this case we are asked to decide whether homeowners and a homeowners association may recover damages in negligence from the developer, contractor and subcontractors who built their dwellings for construction defects that have not caused property damage. Plaintiffs would find an affirmative answer in the tort of “negligent interference with prospective economic advantage” described in J’Aire Corp. v. Gregory (1979) 24 Cal.3d 799, 804-805 [157 Cal.Rptr. 407, 598 P.2d 60]. Applying settled law limiting the recovery of economic losses in tort actions (Seely v. White Motor Co. (1965) 63 Cal.2d 9, 18 [45 Cal.Rptr. 17, 403 P.2d 145]), we answer the question in the negative and, thus, affirm the decision of the Court of Appeal.
I. Background
This matter comes to us on review of consolidated writ proceedings affecting two cases in the superior court. Plaintiffs in Aas v. William Lyon Co. (Super. Ct. San Diego County, 1996, No. 695611) (Aas) own the *633 single-family homes in the Belle Fleur subdivision. Plaintiff in Provencal Community Assn. v. William Lyon Co. (Super. Ct. San Diego County, 1996, No. 694688) (Provencal) is the homeowners association responsible for managing and maintaining the Provencal condominium project. Defendants (as relevant here) include the William Lyon Company and Lyon Communities, Inc. (collectively Lyon), which served as developer and general contractor of. Belle Fleur and Provencal, and the many subcontractors who participated in those projects.
Plaintiffs in each case allege their dwellings suffer from a variety of construction defects affecting virtually all components and aspects of construction. Based on these defects, plaintiffs assert causes of action for negligence, strict liability, breach of implied warranty and, in the Aas case alone, breach of contract and express warranty. Plaintiffs in both cases seek, among other things, the cost of repairing the alleged defects. Additionally, plaintiffs in Aas expressly seek damages representing the diminution in value of their residences.
Trial has not yet commenced. In pretrial proceedings, defendants in both cases moved for orders in limine excluding evidence of those alleged construction defects that have not caused property damage. (There is no claim of personal injury.) Plaintiff in Provencal responded with an offer of proof asserting that some of the alleged defects violate provisions of the applicable building codes intended to prevent harm to life, health and property.[1] Plaintiff acknowledged, however, that many of the defects enumerated in defendants’ motions have not actually caused property damage. The same is true in Aas. After extensive oral argument in each case, the trial *634 court granted defendants’ motions as to plaintiffs’ tort claims only.[2] With the court’s encouragement, plaintiffs sought review of the rulings in limine by petition for writ of mandate. The Court of Appeal, after issuing an alternative writ, denied the petitions. We granted review of that decision.
In granting defendants’ motions, the trial court did not create or adopt a definitive list of construction defects to be excluded at trial. Instead, the court simply excluded “evidence of [defects] . . . that have not resulted in bodily injury or physical property damage, i.e., [defects causing only] ‘economic loss’ . . . .” The trial court illustrated the possible effect of its ruling with the example of “a home with no resultant damages at all, but everybody agrees that the flashing’s not lapped properly under the industry standards, the [Uniform Building Code], whatever, but it hasn’t resulted in any leaks; everybody agrees that the tile is overextended, that is, it doesn’t have the overlap of three inches that’s called for by the manufacturer; that you have a nailing pattern on the shear walls which does not comply with the applicable provision in the [Uniform Building Code], but the house is still standing and hasn’t started swaying . . . .” The court and the parties seemed to recognize that further hearings (see generally Evid. Code, § 402 [procedure for determining preliminary facts]) would be necessary to determine which alleged defects would, and would not, be submitted to the trier of fact in connection with plaintiffs’ tort claims.[3]
The absence of a definitive list of excluded defects is of no consequence because the issue before us is one of law. While a ruling excluding evidence is not ordinarily subject to review by writ (People v. Municipal Court (Ahnemann) (1974) 12 Cal.3d 658, 660 [117 Cal.Rptr. 20, 527 P.2d 372]) and typically is reviewed for abuse of discretion on appeal (People v. Williams (1997) 16 Cal.4th 153, 197 [66 Cal.Rptr.2d 123, 940 P.2d 710]), a motion to exclude all evidence on a particular claim is subject to independent review as the functional equivalent of a common law motion for judgment on the pleadings (Edwards v. Centex Real Estate Corp. (1997) 53 Cal.App.4th 15, 26-27 [61 Cal.Rptr.2d 518]; Clemens v. American Warranty Corp. (1987) 193 Cal.App.3d 444, 451-452 [238 Cal.Rptr. 339]; see generally 6 Witkin, Cal. Procedure (4th ed. 1997) Proceedings Without Trial, *635 § 176, pp. 589-591) or, if decided in light of evidence produced during discovery, a motion for nonsuit (Edwards v. Centex Real Estate Corp., at p. 27). Understood as a motion for judgment on the pleadings, the dispositive question is whether plaintiffs may state a cause of action for construction defects that have not caused property damage. (Cf. id. at p. 26.) Understood as a motion for nonsuit, the question is whether, disregarding conflicting evidence, indulging in every legitimate inference that may be drawn from the evidence, and viewing the record in the light most favorable to plaintiffs, evidence of construction defects that have not caused property damage will support a judgment in plaintiffs’ favor. (Cf. id. at pp. 27-28; see also Casey v. Overhead Door Corp. (1999) 74 Cal.App.4th 112, 123-124 [87 Cal.Rptr.2d 603] [offer of proof may defeat nonsuit based on exclusion of evidence].) Accordingly, however we view the orders on review, the sole question before us is one of law.
II. Discussion
We turn, then, to the question at hand: May plaintiffs recover in negligence from the entities that built their homes a money judgment representing the cost to repair, or the diminished value attributable to, construction defects that have not caused property damage? Plaintiffs define construction defects as deviations from the applicable building codes or industry standards. Strict liability is not here at issue. While plaintiffs have asserted strict liability claims, they no longer argue that strict liability provides a remedy for defects that have not caused property damage. We need not address liability for construction defects that have caused property damage, if any have, because the trial court’s ruling does not prevent plaintiffs from introducing evidence of such defects. Nor, finally, does the ruling prevent plaintiffs from introducing any evidence relevant to their claims for breach of contract or warranty, assuming those claims survive to trial, even if that evidence has been excluded for the purposes of plaintiffs’ tort claims.
This procedural posture makes the question we address fairly narrow. The question, however, is not simple, because it arises from the nebulous and troublesome margin between tort and contract law. (See generally Erlich v. Menezes (1999) 21 Cal.4th 543, 550-551 [87 Cal.Rptr.2d 886, 981 P.2d 978]; Freeman & Mills, Inc. v. Belcher Oil Co. (1995) 11 Cal.4th 85, 105-107 [44 Cal.Rptr.2d 420, 900 P.2d 669] (cone. & dis. opn. of Mosk, J.).) Speaking very generally, tort law provides a remedy for construction defects that cause property damage or personal injury. Focusing on the conduct of persons involved in the construction process, courts in this state have found *636 such a remedy in the law of [4] Viewing the home as a product, courts have also found a tort remedy in strict products liability,[5] even when the property damage consists of harm to a sound part of the home caused by another, defective part.[6] For defective products and negligent services that have caused neither property damage nor personal injury, however, tort remedies have been uncertain. Any construction defect can diminish the value of a house. But the difference between price paid and value received, and deviations from standards of quality that have not resulted in property damage or personal injury, are primarily the domain of contract and warranty law or the law of fraud, rather than of negligence. In actions for negligence, a manufacturer’s liability is limited to damages for physical injuries; no recovery is allowed for economic loss alone. (Seely v. White Motor Co., supra, 63 Cal.2d 9, 18.) This general principle, the so-called economic loss rule, is the primary obstacle to plaintiffs’ claim.[7]
Plaintiffs contend the decision' in J’Aire Corp. v. Gregory, supra, 24 Cal.3d 799 (J’Aire) overcomes this obstacle. According to plaintiffs, when the parties occupy the “special relationship” defined in J’Aire (id. at p. 804), *637 there is both a duty to avoid negligently injuring a person’s economic interests and a right to recover for such injury, even though unaccompanied by any injury to person or property. Before addressing J Aire’s significance and application to this case, we review the law to which J’Aire is said to constitute an exception.
Formerly, after a builder had completed a structure and the purchaser had accepted it, the builder was not liable to a third party for damages suffered because of the work’s condition, even though the builder was negligent. (E.g., Fanjoy v. Seales (1865) 29 Cal. 243, 249-250; see also Hale v. Depaoli, supra, 33 Cal.2d 228, 230 [reviewing the former law].) The purchaser, of course, had remedies against the builder in contract and warranty. But injured third parties had no clear remedy until we, following the trend that began with MacPherson v. Buick Motor Co. (1916) 217 N.Y 382 [111 N.E. 1050], qualified the general rule exonerating manufacturers from third party claims with an exception applicable whenever “ ‘the nature of a [manufactured] thing is such that it is reasonably certain to place life and limb in peril when negligently made . . . .’” (Kalash v. Los Angeles Ladder Co. (1934) 1 Cal.2d 229, 231-232 [34 P.2d 481], quoting MacPherson v. Buick Motor Co., supra, 111 N.E. 1050, 1053.) Having already held that the manufacturers of defective ladders (Kalash v. Los Angeles Ladder Co., at pp. 231-233), elevators (Dahms v. General Elevator Co. (1932) 214 Cal. 733, 737-742 [7 P.2d 1013]), and tires (Nebelung v. Norman (1939) 14 Cal.2d 647, 654 [96 P.2d 327]) could be liable to persons not in contractual privity with them yet foreseeably injured by their products, we easily applied the same rule to someone responsible for part of a house, i.e., a defective railing (Hale v. Depaoli, at pp. 230-232).
We first recognized a remedy in the law of negligence for construction defects causing property damage, as opposed to personal injury, in Stewart v. Cox, supra, 55 Cal.2d 857. There, we upheld a homeowner’s judgment against a subcontractor who had negligently applied concrete to the inside of a swimming pool, thereby causing the release of water that damaged the pool, lot and house. In our opinion we noted, and seemingly were influenced by, the “ ‘decisions . . . plac[ing] building contractors on the same footing as sellers of goods, and . . . [holding] them to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by the negligence, even after acceptance of the work.’ ” (Id. at p. 862, quoting Prosser, Torts (2d ed. 1955) pp. 517-519.) The deciding factor in finding liability, however, appears to have been our own then recent decision in Biakanja v. Irving (1958) 49 Cal.2d 647 [320 P.2d 16, 65 A.L.R.2d 1358] (Biakanja). In Biakanja, we had held that the intended beneficiary of a failed testamentary gift could recover damages from a *638 notary public who, practicing law without a license, negligently prepared the will and failed to have it properly solemnized. Because Biakanja is the acknowledged basis for the later decision in J’Aire, supra, 24 Cal.3d 799, 804, the case on which plaintiffs here primarily rely, it will be discussed in more detail later (at p. 643, post). At this point, it suffices to note that Biakanja held that the negligent performance of a contractual obligation, resulting in damage to the property or economic interests of a person not in privity, could support recovery if the defendant was under a duty to protect those interests. (Biakanja, at pp. 648-650.) “The determination whether in a specific case the defendant will be held liable to a third person not in privity,” we wrote, “is a matter of policy and involves the balancing of various factors . . . .” (Id. at p. 650.)[8] Applying those factors to the negligent concrete subcontractor in Stewart v. Cox, supra, 55 Cal.2d 857), we determined that he should not be exempted from liability proximately caused by his negligence. His work, we explained, was specifically intended to affect the plaintiffs; damage to their property was foreseeable if the work were negligently done; and serious damage actually occurred. (Id. at p. 863.)
Two years later, we again applied Biakanja, supra, 49 Cal.2d 647, to uphold a judgment for property damage caused by negligent residential construction. (Sabella v. Wisler, supra, 59 Cal.2d 21, 29 (Sabella).) The defendant had built a house and offered it for sale to the general public. As it turned out, the defendant’s negligent preparation of the lot, in combination with a subcontractor’s careless plumbing work, later caused leaks, subsidence and damage to the house. The purchasers sued for negligence. The builder, arguing against the imposition of tort liability, sought to distinguish the recent decision in Stewart v. Cox, supra, 55 Cal.2d 857 (Stewart), on the ground “that damage to property other than the swimming pool [in Stewart\ was foreseeable, [whereas] ... the only harm foreseeable [in Sabella] . . . was damage to the house itself.” (Sabella, at p. 29.) We rejected the asserted distinction because we had already determined “in the Stewart case that the liability of a contractor should be determined by the consideration and weighing of the various factors bearing upon liability [i.e., the factors set out in Biakanja at page 650], rather than by resort to special rules or distinctions.” (Sabella, at p. 29.)
In the years following Sabella, supra, 59 Cal.2d 21, the law governing tort remedies for construction defects diverged into two distinct theories: (1) *639 strict products liability; and (2) the theory of negligence outlined in Biakanja, supra, 49 Cal.2d 647, and further developed in J’Aire, supra, 24 Cal.3d 799.
We first embraced the doctrine of strict products liability in Greenman v. Yuba Power Products, Inc. (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049], just a week after deciding Sabella, supra, 59 Cal.2d 21. A few years later, the court in Kriegler v. Eichler Homes, Inc., supra, 269 Cal.App.2d 224 (Kriegler), applied the new tort to mass-produced homes, reasoning that in “today’s society, there are no meaningful distinctions between [the] mass production and sale of homes and the mass production and sale of automobiles and that the pertinent overriding policy considerations are the same.” (Id. at p. 227; see also Avner v. Longridge Estates, supra, 272 Cal.App.2d 607, 609-615 [examining and following Kriegler).) The relevant policy considerations, the Kriegler court explained, were the average home buyer’s reliance on the builder’s skill and implied representations of fitness, and the public interest in assigning the cost of foreseeable injuries to the developer who created the danger. (Kriegler, at p. 228; cf. Greenman v. Yuba Power Products, Inc., at pp. 63-64.)
While these decisions applied the doctrine of strict liability to mass-produced homes,[9] they did not create a remedy for defects that have not caused property damage or personal injury. Whatever the product, whether homes or automobiles, strict liability affords a remedy only when the defective product causes property damage or personal injury. The tort does not support recovery of damages representing the lost benefit of a bargain, such as the cost of repairing a defective product or compensation for its diminished value. We explained this principle in Seely v. White Motor Co., supra, 63 Cal.2d 9 (Seely). “The distinction that the law has drawn between tort recovery for physical injuries and warranty recovery for economic loss,” we wrote, “is not arbitrary and does not rest on the Tuck’ of one plaintiff in having an accident causing physical injury. The distinction rests, rather, on an understanding of the nature of the responsibility a manufacturer must undertake in distributing his products.” (Id. at p. 18.) A manufacturer “can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety,” but not “for the level of performance” of its products unless the manufacturer “agrees that the product was designed to meet the consumer’s demands.” (Ibid.) Similarly, “[a] *640 consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees' that it will.” (Ibid.)
Applying these principles, we concluded in Seely, supra, 63 Cal.2d 9, that the plaintiff could not recover in strict liability or negligence for the cost of repairing a defective truck or for business income lost because the truck could not make deliveries. “Even in actions for negligence,” we wrote, “a manufacturer’s liability is limited to damages for physical injuries and there is no recovery for economic loss alone.” (Id. at p. 18.) Plaintiffs argue that this statement, and Seely's other observations about damages for negligence, were dictum because the court actually upheld, on a breach of express warranty theory, an award of damages representing the purchase price of the truck and lost profits. (Id. at p. 13.) Indeed, the statement can be seen either as dictum or as part of the court’s rationale for permitting the Seely plaintiff to recover his economic losses in warranty rather than in tort. Which label we attach to the statement is of no consequence. This is because the principle articulated in Seely has by critical examination and application in subsequent cases been confirmed as law. Courts routinely apply Seely in strict liability and negligence cases alike to distinguish recoverable damages for physical injury from unrecoverable damages representing the benefit of a contractual bargain.
In Zamora v. Shell Oil Co. (1997) 55 Cal.App.4th 204, 208-211 [63 Cal.Rptr.2d 762], for example, homeowners were not allowed to recover in negligence or strict liability for the cost of replacing water pipes known to be defective, but which had not yet leaked. In Fieldstone v. Briggs Plumbing Products, Inc. (1997) 54 Cal.App.4th 357, 363-367 [62 Cal.Rptr.2d 701], a strict liability case, a general contractor was not awarded the cost of replacing installed sinks that rusted and chipped prematurely, because no other property had been damaged. In San Francisco Unified School Dist. v. W.R. Grace & Co. (1995) 37 Cal.App.4th 1318, 1327-1330 [44 Cal.Rptr.2d 305], a public school district could not state a cause of action in negligence or strict liability based on the presence of asbestos products in its buildings, when the products had not contaminated the buildings by releasing friable asbestos. In Sacramento Regional Transit Dist. v. Grumman, Flxible (1984) 158 Cal.App.3d 289, 293-298 [204 Cal.Rptr. 736], the court held a transportation district could not recover in negligence or strict liability for the cost of repairing defective bus parts that had not caused further damage. “We believe,” the court explained, that “the line between physical injury to property and economic loss reflects the line of demarcation between tort theory and contract theory.” (Id. at p. 294.) As one final example, significant *641 because of its similarity to the case before us, the court in Casey v. Overhead Door Corp., supra, 74 Cal.App.4th 112, 123-124, a negligence case based on defective windows in mass-produced housing, relied on Seely, supra, 63 Cal.2d 9, to uphold an order excluding testimony about damages representing the cost to replace defective windows that had not caused property damage and a nonsuit based on that order. “A consumer,” the court explained, “may not recover economic loss damages against the manufacturer of a defective product in a cause of action for strict liability or negligence, (Seely[, at p.] 18 . . . .) fl[] Since plaintiffs could not recover economic losses [i.e., the cost of repairing and replacing the defective windows], testimony on that item of damages would have been irrelevant.” (Casey v. Overhead Door Corp., at p. 123.)
Over time, the concept of recoverable physical injury or property damage expanded to include damage to one part of a product caused by another, defective part. Examples include cases in which poorly prepared lots subsided, damaging the houses built thereon (Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 615, 616-623), in which defective bottle caps ruined wine (International Knights of Wine, Inc. v. Ball Corp. (1980) 110 Cal.App.3d 1001, 1003-1005 [168 Cal.Rptr. 301] (lead opn. of Roth, P. J.); see also id. at p. 1008 (cone. opn. of Fleming, J.)), and in which an unknown defect in an engine compartment started a fire that destroyed the entire automobile (Ghema v. Ford Motor Co. (1966) 246 Cal.App.2d 639, 644, 649-651 [55 Cal.Rptr. 94]). Indeed, the decision in Seely, supra, 63 Cal.2d 9, suggested these results by intimating that further damage to a truck caused by a manufacturing defect might be recoverable in strict liability or negligence, even though the cost of repairing the original defect was not. (Id. at p. 19; see generally Stearman v. Centex Homes, at pp. 616-623 [extensively discussing the point].)
Plaintiffs argue no requirement of property damage exists, at least in the context of residential construction. The cases discussed above do not support the argument. They go only so far as to hold that property damage compensable in tort can exist when a defective component damages other parts of the same product. Plaintiffs attempt to find a more favorable rule in the two older cases noted above, Stewart, supra, 55 Cal.2d 857, and Sabella, supra, 59 Cal.2d 21. (See ante, at p. 637 et seq.) Those cases, however, do not establish the rule plaintiffs seek. We held in Stewart that the plaintiff homeowners could recover from a subcontractor for damages to their house and lot caused by water escaping from a negligently built swimming pool. (Stewart, at p. 860.) No question was presented of a defect without resulting property damage. Likewise, Sabella concerned a house damaged by the subsidence of an improperly compacted lot. (Sabella, at pp. 23-27.) Today, *642 after Seely, supra, 63 Cal.2d 9, the plaintiffs in those cases would argue that defective components of the property (in Stewart the concrete in the swimming pool, and in Sabella the lot) had damaged other components, including the houses. (See, e.g., Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 622-623.) Because Stewart and Sabella clearly involved property damage, we find nothing in those decisions to cast doubt on the requirement of property damage later articulated in Seely and the many cases following Seely. (See ante, at p. 639 et seq.)[10]
Plaintiffs also contend the court in Seely, supra, 63 Cal.2d 9, was concerned exclusively with commercial losses or lost business profits, rather than economic losses in a broader sense. To the contrary, the court in Seely was unmistakably concerned not just with lost profits but also with the fundamental difference between, on the one hand, the consumer’s contractual interest in having a product of the expected, bargained-for value and quality, and, on the other hand, the consumer’s tort interest in not suffering property damage or personal injury due to negligence in the manufacturing process. Chief Justice Traynor could not have articulated the point more clearly: “A consumer should not be charged "at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. Even in actions for negligence, a manufacturer’s liability is limited to damages for physical injuries and there is no recovery for economic loss alone.” (Id. at p. 18.) Certainly the opinion also speaks of the manufacturer not being “held for the level of performance of his products in the consumer’s business unless he agrees that the product was designed to meet the consumer’s demands.” (Ibid., italics added.) After all, the immediate factual context of the case before the court included a claim for lost profits. (Id. at p. 13.) But to read this court’s seminal decision in Seely as speaking only to claims for lost profits, and not more generally to the distinction between tort and contract, is to mistake the particular application for the governing principle.
An uncertain number of plaintiffs purchased their houses directly from defendant Lyon. As to these plaintiffs, it is argued, privity of contract offers *643 an additional reason for rejecting any requirement of property damage in an action for negligence based on construction defects. It has been said that “[a] contract to perform services gives rise to a duty of care which requires that such services be performed in a competent and reasonable manner” and that “[a] negligent failure to do so may be both a breach of contract and a tort.” (North American Chemical Co. v. Superior Court (1997) 59 Cal.App.4th 764, 774 [69 Cal.Rptr.2d 466].) Therefore, plaintiffs argue, defendant Lyon’s negligent breach of contractual duties owed directly to plaintiffs to deliver homes in compliance with the applicable building codes is a tort, for which plaintiffs may recover “the amount which will compensate for all the detriment proximately caused thereby . . . .” (Civ. Code, § 3333.)
The argument is not persuasive. A person may not ordinarily recover in tort for the breach of duties that merely restate contractual obligations. Instead, “ ‘[c]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.’ ” (Erlich v. Menezes 21 Cal.4th 543, 552, quoting Freeman & Mills, Inc. v. Belcher Oil Co., supra, 11 Cal.4th 85, 107 (cone. & dis. opn. of Mosk, I.).) This court recently rejected the argument that the negligent performance of a construction contract, without more, justifies an award of tort damages. (Erlich v. Menezes at pp. 550-554 [reversing an award of damages for emotional distress for negligent construction].) In so doing, however, we reiterated that conduct amounting to a breach of contract becomes tortious when it also violates a duty independent of the contract arising from principles of tort law. (Id. at p. 551.) The strict liability and negligence cases discussed above, which hold the builders of homes liable for construction defects causing property damage, may be understood as recognizing such an independent duty. But that duty is limited by the rule in Seely, supra, 63 Cal.2d 9, 18, which bars recovery of economic damages representing the lost benefit of a bargain.
We noted earlier that the law of construction defects after Sabella, supra, 59 Cal.2d 21, diverged into two theories: strict products liability, which we have discussed, and the tort recognized in J'Aire, supra, 24 Cal.3d 799. Apart from the arguments that Seely, supra, 63 Cal.2d 9, does not apply to negligent construction (see ante, at pp. 641-642) and that plaintiffs in privity may recover tort damages for breach of contract (see ante, at p. 642), plaintiffs base their claim exclusively on J'Aire and cases following that decision.
J'Aire, supra, 24 Cal.3d 799, as mentioned, relied on this court’s 1958 decision in Biakanja, supra, 49 Cal.2d 647. In Biakanja, we held that a *644 defendant’s negligent performance of a contractual obligation resulting in damage to the property or economic interests of a person not in privity could support recovery if the defendant was under a duty to protect those interests. The court articulated a case-by-case test for identifying such a duty. “The determination whether in a specific case the defendant will be held liable to a third person not in privity,” we wrote, “is a matter of policy and involves the balancing of various factors . . . .” (Biakanja, at p. 650.) The six factors were: “[1] the extent to which the transaction was intended to affect the plaintiff, [2] the foreseeability of harm to him, [3] the degree of certainty that the plaintiff suffered injury, [4] the closeness of the connection between the defendant’s conduct and the injury suffered, [5] the moral blame attached to the defendant’s conduct, and [6] the policy of preventing future harm.” (Ibid.) In concluding the defendant notary owed a duty to an intended beneficiary not to mishandle the will’s drafting and solemnization, we attached particular importance to the fact that the “ ‘end and aim’ ” of the notary’s service to the testator was “to provide for the passing of [the] estate to [the] plaintiff’ (ibid.), and to the high impropriety of, and need to prevent, the unlicensed practice of law (id. at p. 651).
Twenty-one years later, the court in J’Aire, supra, 24 Cal.3d 799, applied the Biakanja (supra, 49 Cal.2d 647, 650) factors to conclude that the tenant of a building used as a restaurant could state a cause of action for negligence against a renovation contractor hired by the building’s owner for business income lost when the contractor “fail[ed] to complete the project with due diligence.” (J’Aire, at pp. 802, 804-805.) Applying the Biakanja factors, the court held that a “special relationship” (J’Aire, at p. 804) permitting recovery of economic losses (i.e., the relationship defined by the Biakanja test) existed between the contractor and the tenant. The court dismissed concerns that such a theory of recovery would threaten liability, out of proportion to fault, for remote consequences and speculative damages. (J’Aire, at pp. 807-808.) In the court’s view, the Biakanja factors, in combination with “ordinary principles of tort law such as proximate cause,” were “fully adequate to limit recovery” of purely economic damages “without the drastic consequence of an absolute rule which bars recovery in all such cases.” (J’Aire, at p. 808.)
The lower courts have applied the theory of liability articulated in J’Aire, supra, 24 Cal.3d 799, in a wide variety of cases. To mention just a few, courts have relied on J’Aire to assess a chemical manufacturer’s claim against a transportation company for business losses caused by the contamination of its product in shipment (North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 781-785); a dairy’s claim against the manufacturer of an allegedly defective milking machine for lost profits and *645 property damage (Ott v. Alfa-Laval Agri, Inc. (1995) 31 Cal.App.4th 1439, 1448-1457 [37 Cal.Rptr.2d 790]); a construction lender/mortgagee’s claim against a builder for construction defects (Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal.App.3d 211, 223-226); an abalone packer’s claim for lost profits against the manufacturer of unusable cans (Ales-Peratis Foods Internat., Inc. v. American Can Co. (1985) 164 Cal.App.3d 211, 284-290 [209 Cal.Rptr. 917]); and real estate investors’ claims for the cost of repairing construction defects in an apartment building (Huang v. Gamer, supra, 157 Cal.App.3d 404, 422-425; see post, at p. 648 et seq.).
The lower courts have also expanded upon J’Aire, supra, 24 Cal.3d 799. While the court in J’Aire purported only to address duties owed to persons not in contractual privity with the defendant (id. at p. 804), courts subsequently have applied J’Aire to cases in which privity did exist. These courts have concluded that “the reasoning of J’Aire is wholly incompatible with a limitation of the cause of action to those instances in which the plaintiff and defendant are not in privity . . . .” (Ott v. Alfa-Laval Agri, Inc.; supra, 31 Cal.App.4th 1439, 1448; see also North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 783; Pisano v. American Leasing (1983) 146 Cal.App.3d 194, 197 [194 Cal.Rptr. 77] [both applying J’Aire in cases apparently involving privity].)
Plaintiffs contend that J’Aire, supra, 24 Cal.3d 799, when it applies, displaces the general rule (Seely, supra, 63 Cal.2d 9, 18) that damages are not recoverable for product defects that have not caused property damage.[11] Plaintiffs base the contention on the following statement in J’Aire: “Where the risk of harm is foreseeable, ... an injury to the plaintiff’s economic interests should not go uncompensated merely because it was unaccompanied by any injury to his person or property.” (J’Aire, at p. 805.) The validity of the orders on review depends largely on the significance of that statement. Paraphrasing it, one might ask the dispositive question this way; Does the law of negligence protect plaintiffs’ economic interests in having houses that fully comply with the building codes, measured by the cost of repairs or diminished value associated with noncompliance, even though the asserted harm to those interests is unaccompanied by any injury to person or property?
*646 To apply the multifactored balancing test set out in J’Aire, supra, 24 Cal.3d 799, 804, tends to involve a court in making fairly subjective judgments. In this case, however, a relatively objective obstacle to plaintiffs’ claim appéars in factor (3), which looks to “the degree of certainty that the plaintiff suffered injury . . . .” (Ibid.) Construction defects that have not ripened into property damage, or at least into involuntary out-of-pocket losses, do not comfortably fit the definition of “ ‘appreciable harm’ ” —an essential element of a negligence claim. (Davies v. Krasna (1975) 14 Cal.3d 502, 513 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; see San Francisco Unified School Dist. v. W.R. Grace & Co., supra, 37 Cal.App.4th 1318, 1327-1331 [the presence of asbestos products in buildings did not, prior to the release of friable asbestos, constitute actual and appreciable harm under Davies v. Krasna]; Zamora v. Shell Oil Co., supra, 55 Cal.App.4th 204, 208-211 [finding no cognizable damage in the cost of replacing defective pipes that had not yet leaked].) The breach of a duty causing only speculative harm or the threat of future harm does not normally suffice to create a cause of action. (Davies v. Krasna, at p. 513.) For the same reason—because the physical harm traditionally compensable in tort is lacking—to ask in the words of factor (2) whether the harm to plaintiffs was “foreseeab[le]” (J’Aire, at p. 804) simply begs the question: What harm?
Plaintiffs argue that the cost of repairs is an accepted measure of damage for construction defects and that plaintiffs could make the cost of repairs certain within the meaning of J’Aire, supra, 24 Cal.3d 799, 804, by voluntarily repairing defects and obtaining a receipt for money spent. This confuses the measurement of alleged damages with the ability of particular facts to support a tort action. To say that one’s house needs repairs costing a certain amount is not necessarily to say that one has suffered the type of harm cognizable in tort, as opposed to contract. Plaintiffs also argue that “the degree of certainty that the plaintiff suffered injury” (ibid.) is merely a factor to be balanced with the other factors set out in J’Aire for determining a person’s liability for negligently injuring another’s economic interests. We do not believe, however, that the J’Aire court intended to dispense with the rule that appreciable, nonspeculative, present injury is an essential element of a tort cause of action. (Davies v. Krasna, supra, 14 Cal.3d 502, 513; cf. Romano v. Rockwell Internal, Inc. (1996) 14 Cal.4th 479, 500-503 [59 Cal.Rptr.2d 20, 926 P.2d 1114] [plaintiff suffered appreciable harm sufficient to support a tort claim for wrongful discharge upon actual termination rather than upon prospective notification].) Lacking that fundamental prerequisite to a tort claim, it is difficult to imagine what other factors, singly or in combination, might justify the court in finding liability.
Turning to the other factors, we find no adequate justification. We may assume for argument’s sake that the conduct of a person engaged in construction is “intended to affect” all foreseeable purchasers of the property.
*647 (J’Aire, supra, 24 Cal.3d 799, 804 [factor (1)]; see also Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal.App.3d 211, 224; Huang v. Gamer, supra, 157 Cal.App.3d 404, 423-424; Cooper v. Jevne, supra, 56 Cal.App.3d 860, 869.) We may also assume that a sufficiently “close[] connection [exists] between . . . defendant’s conduct” and the alleged defects. (J’Aire, at p. 804 [factor (4)].) Also, while some “moral blame” arguably “attach[es]” to many deviations from the building codes (ibid, [factor (5)]), the degree of blame would appear to depend upon the nature of the deviation. Thus, even if significant moral blame inheres in negligent construction creating a risk of likely structural failure leading to a notice of abatement (Huang v. Gamer, at p. 424 & fn. 13), we may still reasonably assign reduced moral blame to less serious defects not presenting that degree of risk, and to such flaws as doors that are out of plumb, discolored drain stoppers, and inoperable garbage disposals, to take a few examples from this case. Factor (6), the last factor, looks to “the policy of preventing future harm.” (J’Aire, at p. 804.) Certainly, as plaintiff in Provencal noted in its offer of proof, the express purpose of the building codes is to “provide minimum standards to safeguard life or limb, health, property and public welfare . . . .” (U. Bldg. Code, § 102, Cal. Code Regs., tit. 24, former § 2-102.) Plaintiffs have not shown, however, that any of the alleged defects actually poses a serious risk of harm to person or property. To say, as plaintiffs do, that the purpose of construction standards for shear walls is to “minimize property damage and personal injury in the event of seismic and wind forces,” is not to say that any given defect is sufficiently grave to pose a realistic risk of structural failure. In conclusion, applying the J’Aire factors, we do not find they justify a broad rule permitting recovery of repair costs unaccompanied by property damage or personal injury.
Plaintiffs contend precedent requires a different result. “[E]very reported decision applying the J’Aire[, supra, 24 Cal.3d 799, 804] factors to residential construction,” they argue, “has allowed the recovery of economic loss,” meaning, in this context, the cost of repairing defects that have not caused property damage. The decisions plaintiffs cite, however, do not strongly support their position. The courts in Sumitomo Bank v. Taurus Developers, Inc., supra, 185 Cal.App.3d 211, and Cooper v. Jevne, supra, 56 Cal.App.3d 860 (which predated J’Aire and relied on Biakanja, supra, 49 Cal.2d 647), simply held that the plaintiffs in those cases had stated causes of action and, thus, reversed judgments of dismissal entered after demurrers were erroneously sustained. The court in Sumitomo Bank v. Taurus Developers, Inc., did not address the distinction between economic damages and physical harm; no such issue was raised. The court in Cooper v. Jevne held that the plaintiff homeowners had stated a cause of action in negligence against the architects of their houses, with whom the plaintiffs were not in privity. As damages for *648 their negligence cause of action, the plaintiffs sought the cost of repairs, compensation for lost use and income, and “[p]ast and future damage to personal property,” among other things. (Cooper v. Jevne, supra, 56 Cal.App.3d at p. 867, fn. 2.) That the plaintiffs had stated a cause of action was established by the architects’ concession that their professional liability to the plaintiffs not in privity of contract with them extended to property damage. (Id. at p. 868, fn. 3.) For this reason, and because the question was not before the court on demurrer, the court’s conclusion that Seely’s economic loss rule does not apply to professional negligence claims (Cooper v. Jevne, at p. 869) is dictum. The court, in any event, acknowledged Seely’s continuing relevance to the liability of a manufacturer for product defects. (Cooper v. Jevne, at p. 868.) Furthermore, unlike the judgments of dismissal on appeal in Sumitomo Bank v. Taurus Developers, Inc., and Cooper v. Jevne, the instant rulings in limine do not preclude plaintiffs from presenting to the trier of fact whatever claims for property damage may exist.[12]
Plaintiffs place particular emphasis on Huang v. Garner, supra, 157 Cal.App.3d 404 (Huang). The court in that case relied on J’Aire, supra, 24 Cal.3d 799, to reverse a nonsuit for the defendants (a developer and a contractor) on the plaintiff real estate investors’ claims for the cost of repairing defects in an apartment building. Some of the alleged defects had caused property damage, and some had not. (Huang, at pp. 419-425.) The Huang *649 court found the “certainty” of injury required by J’Aire (at p. 804) in plaintiffs’ duty to comply with a notice of abatement citing likely structural failure and requiring specific repairs. (Huang, at p. 424 & fn. 13.) Yet Huang’s analysis is not entirely satisfactory because other alleged construction defects in that case had neither caused property damage nor been cited in the notice of abatement. (Compare id. at pp. 419-420 [summary of alleged defects] with id. at p. 424, fn. 13 [order of abatement].) Even accepting for the sake of argument the Huang court’s suggestion that a notice of abatement might suffice to convert repair costs into tort damages, the decision offers no adequate explanation for permitting the plaintiffs, consistently with Seely, supra, 63 Cal.2d 9, to recover repair costs for the other defects that had neither appeared in the notice nor resulted in property damage. Accordingly, we disapprove Huang to the extent it is inconsistent with the views set out in this opinion.
Whether viewed as part of the test set out in J’Aire, supra, 24 Cal.3d 799, 804, or as an independent argument for extending tort liability, the “policy of preventing future harm” (ibid, [factor (6)]) is probably plaintiffs’ strongest argument. In some sense, that policy might be served by a rule of tort liability making builders, in effect, the insurers of building code compliance, even as to defects that have not caused property damage or personal injury. Moreover, as plaintiffs argue, to require builders to pay to correct defects as soon as they are detected rather than after property damage or personal injury has occurred might be less expensive. On the other hand, such a rule would likely increase the cost of housing by an unforeseeable amount as builders raised prices to cover the increased risk of liability. Such a rule should also be unnecessary to the extent buyers timely enforce their contract, warranty and inspection rights, and to the extent building authorities vigorously enforce the applicable codes for new construction.
The Chief Justice, in his concurring and dissenting opinion, proposes to resolve these conflicting policy considerations with a complex new rule of tort liability (1) barring recovery for minor defects and building code violations that have not caused personal injury or property damage; (2) permitting recovery for serious defects and code violations posing a significant risk of death, personal injury, or considerable property damage; and (3) requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., post, at pp. 653-654, 671, 672-673.)
The proposal entails serious difficulties. First among these is that the Chief Justice, while asserting that our holding “offends . . . established common law” (cone. & dis. opn. of George, C. J., post, at p. 653), nevertheless “agree[s] with the majority to the extent it declines to allow recovery in *650 negligence for the cost of repairing construction defects that pose no significant risk of serious personal injury or property damage” (id. at p. 671). As we have explained, whether the economic loss rule applies depends on whether property damage has occurred rather than on the possible gravity of damages that have not yet occurred. While the Chief Justice rejects our understanding of the economic loss rule, his concurring and dissenting opinion offers no other rationale for denying recovery for minor defects. Although the Chief Justice advances policy considerations to justify providing recovery for serious defects, his narrow conception of the economic loss rule as applicable only to commercial losses (cone. & dis. opn. of George, C. J., post, at p. 657; but see this opn., ante, at p. 642) would seem to compel the court to permit recovery for minor defects, as well. In short, the proposed rule lacks coherence.
The Legislature, whose lawmaking power is not encumbered by precedent, is free to adopt a rule like that proposed in the Chief Justice’s concurring and dissenting opinion. Yet even if the proposed rule could plausibly be defended as a logical development of the common law, and thus appropriate for judicial rather than legislative promulgation, the rule’s shortcomings would counsel its rejection. The distinction between serious and minor defects has a superficial theoretical appeal that evaporates in practice. Amicus curiae Structural Engineers Association of California, which supports plaintiffs’ position in this court, aptly demonstrates that almost any building code violation can, under the right set of assumptions and circumstances, be considered serious.[13] “[Tjhere is no mechanism at this level to separate life safety defects from cosmetic defects,” amicus curiae argues; such questions, in its view, are “better left to the trier of fact after a complete presentation of expert testimony on both sides.” If experts claim to be unable before trial to rule out any building code violations as trivial, then a rule looking to the potential seriousness of possible property damage, rather than the existence of actual damage, is very likely to frustrate the pretrial disposition of claims based on trivial defects. Such a rule, by forcing judges *651 to attempt to predict the likelihood that any given defect will cause property damage and, if so, its likely seriousness, will make it difficult for them to screen out trivial claims as a matter of law. Because, moreover, the rule invites a speculative inquiry, any pretrial dispositions based thereon are likely to be inconsistent[14] and challenged on appeal. In short, the practical effect of a rule permitting recovery for “serious” defects only, however well intentioned, would likely be to insulate from demurrer and summary judgment virtually all complaints containing allegations of building code violations.
The Chief Justice’s suggestion that courts should supervise the disbursement of tort damages (conc. & dis. opn. of George, C. J., post, at pp. 663-664, 672-673) highlights a final difficulty with the rule he proposes. Ordinarily, nothing compels a successful plaintiff to spend money recovered in construction defect litigation on repairs. Indeed, plaintiffs in Aas expressly seek in their complaint, in addition to the cost of repairs, damages representing the “diminution in value” of their residences.[15] The possibility that tort damages will not actually be spent on repairs, defendants contend, weakens the argument that imposing liability for construction defects without resulting damage will serve the policy goal of improving the state’s housing stock. *652 The rule the Chief Justice proposes would address this concern by requiring court-supervised disbursement of all damages awarded to ensure that repairs are actually made. (Conc. & dis. opn. of George, C. J., at pp. 672-673.) Again, while such a rule might be appropriate as legislation, to reconcile it with the traditional role of the judiciary is very difficult, indeed. While there have been exceptions, courts do not ordinarily tell successful plaintiffs how to spend their tort recoveries.[16] That judicial control over the proceeds might be necessary to render the proposed liability rule fair suggests the rule tries the limits of our power to expound the common law.
In our view, the many considerations of social policy this case implicates, rather than justifying the imposition of liability for construction defects that have not caused harm of the sort traditionally compensable in tort (Seely, supra, 63 Cal.2d 9, 18), serve instead to emphasize that certain choices are better left to the Legislature. That body has at its disposal a wider range of options and superior access to information about the social costs and benefits of each. “Legislatures, in making such policy decisions, have the ability to gather empirical evidence, solicit the advice of experts, and hold hearings at which all interested parties may present evidence and express their views . . . .” (Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654, 694, fn. 31 [254 Cal.Rptr. 211, 765 P.2d 373]; see also Moore v. Regents of University of California (1990) 51 Cal.3d 120, 147 [271 Cal.Rptr. 146, 793 P.2d 479, 16 A.L.R. 4th 903],)[17]
Home buyers in California already enjoy protection under contract and warranty law for enforcement of builders’ and sellers’ obligations; under the *653 law of negligence and strict liability for acts and omissions that cause property damage or personal injury; under the law of fraud for misrepresentations about the property’s condition; and an exceptionally long 10-year statute of limitations for latent construction defects (Code Civ. Proc., § 337.15). While the Legislature may add whatever additional protections it deems appropriate, the facts of this case do not present a sufficiently compelling reason to preempt the legislative process with a judicially created rule of tort liability.
III. Disposition
The judgment of the Court of Appeal is affirmed.
Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

The following is a representative excerpt from plaintiff’s offer of proof:
“5. During the investigation at Provencal in this case, engineers . . . observed violations of the Uniform Building Code, including failures to properly construct shear walls and failures to properly connect shear walls to other building components. Such shear walls and connections are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of seismic and wind forces. . . .
“6. During the investigation at Provencal in this case, architects . . . observed violations of the Uniform Building Code, including failures to properly construct one-hour and two-hour fire protection in party walls. Such fire protection measures are required under the Uniform Building Code to prevent or minimize property damage and personal injury in the event of a fire. ... nn• ffl
“8. During the investigation of Provencal in this case, [an] electrical engineer . . . observed numerous violations of the National Electrical Code, including failures to support electrical cables, improperly supported light fixtures, and improperly labeled electrical circuits. ... nn... [id
“10. For many of the Uniform Building Code and National Electrical Code violations described in paragraphs 5, 6, and 8, there has not yet been any physical property damage or personal injury. . . .”

Plaintiff in Provencal subsequently moved to amend its complaint to allege a cause of action for breach of implied warranty. Plaintiff’s request for judicial notice of defendant Lyon’s memorandum in opposition to the motion, filed after the Court of Appeal affirmed the trial court’s ruling, is denied.

The trial court explained: “I would address [at trial] any issues that are over and above my ruling that you felt were close calls and listen to what your proffer might be at the appropriate time.” There is, thus, no basis for assuming that every item on the exhaustive lists of construction defects attached to defendants’ motions in limine is deemed excluded, even if plaintiffs are able to prove that a particular defect has actually caused property damage.

Sabella v. Wisler (1963) 59 Cal.2d 21, 27-30 [27 Cal.Rptr. 689, 377 P.2d 889]; Stewart v. Cox (1961) 55 Cal.2d 857, 861-863 [13 Cal.Rptr. 521, 362 P.2d 345]; Hale v. Depaoli (1948) 33 Cal.2d 228, 230-232 [201 P.2d 1, 13 A.L.R.2d 183]; Sumitomo Bank v. Taurus Developers, Inc. (1986) 185 Cal.App.3d 211, 223-224 [229 Cal.Rptr. 719]; Huang v. Garner (1984) 157 Cal.App.3d 404, 419-425 [203 Cal.Rptr. 800]; Cooper v. Jevne (1976) 56 Cal.App.3d 860, 867-869 [128 Cal.Rptr. 724],

Stearman v. Centex Homes (2000) 78 Cal.App.4th 611, 613 [92 Cal.Rptr.2d 761] (citing the many decisions applying strict liability to construction defects); Avner v. Longridge Estates (1969) 272 Cal.App.2d 607, 609-615 [77 Cal.Rptr. 633]; Kriegler v. Eichler Homes, Inc. (1969) 269 Cal.App.2d 224, 227-229 [74 Cal.Rptr. 749],

Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 613-614, 617-623.

Courts in other jurisdictions have reached various conclusions on this subject. South Carolina broadly holds builders liable in tort for all deviations from applicable building code and industry standards that diminish the value of a house. (Kennedy v. Columbia Lumber & Mfg. Co. (1989) 299 S.C. 335 [384 S.E.2d 730, 736-738].) Maryland more narrowly permits homeowners to recover in a negligence action the reasonable cost of correcting construction defects that present “a clear danger of death or personal injury,” but not conditions that present merely “a risk to general health, welfare, or comfort. . . .” (Council of Co-Owners v. Whiting-Turner (1986) 308 Md. 18, 35 [517 A.2d 336, 344-345 & fn. 5].) A North Carolina decision does not clearly identify the circumstances that will support recovery, but holds that the plaintiffs stated a cause of action for negligence by alleging they “were forced to undergo extensive demolition and repair work to correct the defective, dangerous and unsafe conditions caused by the defendant’s negligence.” (Oates v. Jag, Inc. (1985) 314 N.C. 276 [333 S.E.2d 222, 224-226].)
In contrast, the Supreme Court of Nevada, after tentatively rejecting the economic loss rule in construction defect cases (Calloway v. City of Reno (1997) 113 Nev. 564 [939 P.2d 1020, 1024-1026]), reversed course on rehearing and held that no liability exists for defects that cause damage only to the house and its components. (Calloway v. City of Reno (Nev. 2000) 993 P.2d 1259, 1263-1270 [trial court properly dismissed negligence claims alleging that defective framing caused water intrusion, damage to flooring and ceilings, and structural and wood decay].)

The six factors were: “the extent to which the transaction was intended to affect the plaintiff, the foreseeability of harm to him, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant’s conduct and the injury suffered, the moral blame attached to the defendant’s conduct, and the policy of preventing future harm.” (Biakanja, supra, 49 Cal.2d 647, 650.)

See generally Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 613. Compare Peterson v. Superior Court (1995) 10 Cal.4th 1185, 1200 [43 Cal.Rptr.2d 836, 899 P.2d 905], Cronin v. J.B.E. Olson Corp. (1972) 8 Cal.3d 121, 130 [104 Cal.Rptr. 433, 501 P.2d 1153], and Price v. Shell Oil Co. (1970) 2 Cal.3d 245,251 and footnote 6 [85 Cal.Rptr. 178,466 P.2d 722] (all acknowledging the doctrine’s potential applicability to persons in the business of residential construction).

The concurring and dissenting justices would hold that property damage occurs when a defective component is incorporated into a house. (Cone. & dis. opn. of Mosk, J., at pp. 674-675; see also cone. & dis. opn. of George, C. J., at p. 673, fn. 11.) The decision offered as support for that view, Eljer Mfg., Inc. v. Liberty Mut. Ins. Co. (7th Cir. 1992) 972 F.2d 805, however, offers its conclusion not as a rule of tort liability but as an interpretation of contractual language in an insurance policy. While we intimate no view as to Eljer’s correctness as a matter of California law, we find the decision insufficiently relevant to the question before us to be of any assistance.

Plaintiffs also argue that Seely, supra, 63 Cal.2d 9, does not apply to the negligent performance of services, as distinguished from the negligent manufacture of products, but the basis for that argument appears, once again, to be that J’Aire, supra, 24 Cal.3d 799, takes precedence over Seely. (See North American Chemical Co. v. Superior Court, supra, 59 Cal.App.4th 764, 778-785, and Huang v. Gamer, supra, 157 Cal.App.3d 404, 421-424 [both concluding that liability under J’Aire is unaffected by Seely]; cf. Cooper v. Jevne, supra, 56 Cal.App.3d 860, 867-869 [relying on Biakanja, supra, 49 Cal.2d 647, rather than J’Aire, to reach the same conclusion].)

In addition to these cases cited by plaintiffs, the Chief Justice relies on Connor v. Great Western Sav. & Loan Assn. (1968) 69 Cal.2d 850 [73 Cal.Rptr. 369, 447 P.2d 609, 39 A.L.R.3d 224], Krusi v. S.J. Amoroso Construction Co. (2000) 81 Cal.App.4th 995 [97 Cal.Rptr.2d 294], Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, and Kern Investments, Inc. v. Cube Co. (1998) 63 Cal.App.4th 1412 [74 Cal.Rptr.2d 744]. None of these cases purports to hold that a plaintiff may recover for construction defects that have not caused damage to other property.
In Connor v. Great Western Sav. & Loan Assn., supra, 69 Cal.2d 850, this court held that persons whose homes “suffered serious damage from cracking caused by ill-designed foundations” (id. at p. 856) could sue the construction lender as the joint venturer of the developer on the theory that it owed the plaintiffs a duty to “exercise reasonable care to protect them from damages caused by major structural defects” (id. at p. 866). Thus, to the extent Connor might be thought relevant to the case before us, it is entirely consistent with the rule we apply today. (The Legislature has rejected Connor's holding that construction lenders are liable in negligence for construction defects. See Civ. Code, § 3434.)
The courts in Krusi v. S.J. Amoroso Construction Co., supra, 81 Cal.App.4th 995, 1005, and Kern Investments, Inc. v. Cube Co., supra, 63 Cal.App.4th 1412, 1423-1425, held simply that causes of action for construction defects accrued when the defects caused damage and belonged to the persons who owned the buildings at that time, rather than to the subsequent purchasers. Because the courts in both cases held the plaintiffs lacked standing to sue, neither court faced any question of liability for purely economic damages. In any event, the buildings at issue in both cases had actually suffered major structural damage as a result of construction defects. (Krusi, at p. 998; Keru, at p. 1415.) The court in Stearman v. Centex Homes, supra, 78 Cal.App.4th 611, 616-623, held merely that strict liability applies when a defective component of a house damages a nondefective component. (See p. 641, ante.)

Amicus curiae explains in detail how alleged defects that might on “[i]nitial impression[]” seem “trivial, nitpickey and even ridiculous,” might cause or indicate serious problems. “Closet shelving, interior doors not fitting properly, sagging roof rafters, spalling plaster, [and] GFI [ground fault interrupt] receptacles missing” are cited as examples. Expert testimony at trial, amicus curiae speculates, might show that “the location of the closet shelving in conjunction with the lighting poses a fire hazard and violates the National Electrical Code. The interior doors may not fit properly because the buildings/homes have moved due to structural problems or soil issues. The roof rafters may be sagging because they were not attached properly, and their installation violates the Uniform Building Code. The plaster could be spalling due to missing structural components, and by the way, maybe the plaster is supposed to serve as some shear. The missing GFI receptacles pose a fire hazard and a life safety threat to adults and children and the fact that they are missing violates the National Electrical Code.”

This case illustrates the problem. The Chief Justice apparently concludes that the defects alleged in this case put plaintiffs’ homes at risk of collapse or fire. (Conc. & dis. opn. of George, C. J., post, at p. 654.) To be sure, plaintiffs have alleged that shear and fire walls do not comply with the applicable building codes, and that the purpose of codes for these components is to protect against those sorts of harm. (See ante, at p. 633 & fn. 1.) Yet, as the trial court recognized (see ante, at pp. 633-634), this does not necessarily mean that any given defect is sufficiently grave to pose a realistic risk of serious damage. (See also ante, at pp. 646-647.)

Plaintiffs may be surprised to read in the Chief Justice’s concurring and dissenting opinion that he believes they have abandoned this claim. Plaintiffs did abandon a claim for so-called stigma damages, representing the residual loss of market value after repairs have been made, after losing on this issue in the Court of Appeal. As that court explained, no reported decision in this state appears to authorize such recovery; we intimate no view on the matter.
In contrast, diminished value is simply one of the standard alternative measures of damage for injury to property. The successful plaintiff in such cases ordinarily recovers either the diminution in market value attributable to the injury or the cost of repairs, whichever is less (Mozzetti v. City of Brisbane (1977) 67 Cal.App.3d 565, 576 [136 Cal.Rptr. 751]), although the rule is not rigid and the court may award the greater amount in appropriate circumstances (Heninger v. Dunn (1980) 101 Cal.App.3d 858, 863-864 [162 Cal.Rptr. 104]; see generally 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, §§ 1461-1462, pp. 934-935). Plaintiffs understandably emphasize the cost of repairs in their briefs and argument because damages measured by the cost of repairs typically exceed damages measured by diminution in value.
This case is being remanded for further proceedings, possibly including a trial on any alleged defects that have caused property damage. (See ante, at pp. 634, 635.) Because plaintiffs have not expressly abandoned the right to recover the diminished value of their homes, should that turn out to be the appropriate measure of damages, we see no basis on which to preclude the court from applying the ordinary law of remedies.

Arguing that courts should do so, the Chief Justice cites Potter v. Firestone Tire & Rubber Co. (1993) 6 Cal.4th 965 [25 Cal.Rptr.2d 550, 863 P.2d 795], (Conc. & dis. opn. of George, C. J., at pp. 663-664, 672-673.) The plaintiffs in Potter sought, among other things, medical monitoring costs following their exposure to carcinogenic toxic waste. In a footnote, we noted the suggestion of “[v]arious commentators and courts . . . that creation of court-supervised funds to pay medical monitoring claims as they accrue, rather than the award of a lump-sum verdict, may be a more appropriate mechanism for compensating plaintiffs in a toxic exposure case.” (Id. at p. 1010, fn. 28.) Nothing in the Potter decision, which we painstakingly limited to its specific factual and legal context, suggests that courts have a broad, general role in supervising the disbursement of tort recoveries.

In fact, the Legislature in this term has considered and rejected proposals to make persons engaged in residential construction liable for the cost of bringing homes into compliance with the building codes, without regard to the existence of property damage (Assem. Bill. No. 1669 (1999-2000 Reg. Sess.), as introduced Mar. 15, 1999) and to create a state-sanctioned home warranty program (Assem. Bill No. 1221 (1999-2000 Reg. Sess.)). We note the Legislature is also considering a bill that would recognize a lack of “empirical data on the incidence of construction defects, the amount of construction defects litigation, and whether there is any causal relationship between shoddy construction, construction defect litigation, and the construction of new condominium and affordable housing,” and commission a comprehensive study to collect such data. (Sen. Bill No. 1882 (1999-2000 Reg. Sess.).) Defendants’ motion for judicial notice of these bills is granted.